**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

USDC- GREENBELT
'22 OCT 28 AM11:20

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>[UNDER SEAL],<br><br>PLAINTIFFS,<br><br>v.<br><br>[UNDER SEAL]<br><br>DEFENDANTS | Civil Action No.: _22-CV-2782- PJM_<br><br>**FILED UNDER SEAL**<br>PURSUANT TO 31 U.S.C. § 3730<br>(False Claims Act) |

1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

USDC- GREENBELT
'22 OCT 28 AM 11:22

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | |
| | |
| COMMONWEALTH OF PENNSYLVANIA | |
| | |
| WILLIAM HENNESSEY | |
| 120 Village Drive | Civil Action No.: ___22·CV·2782· PJM___ |
| Greensburg, Pennsylvania 15601 | |
| | |
| ALTOONA AREA SCHOOL DISTRICT | **FILED UNDER SEAL** |
| 1201 8ᵗʰ Avenue | PURSUANT TO 31 U.S.C. § 3730 |
| Altoona, Pennsylvania 16602 | (False Claims Act) |
| | |
| PATRICK REILLY | **JURY TRIAL DEMANDED** |
| 431 Riverview Drive | |
| Youngstown, New York 14174 | |
| | |
| Plaintiffs, | |
| | |
| v. | |
| | |
| UNIVERSITY OF PITTSBURGH MEDICAL | |
| CENTER ALTOONA | |
| 620 Howard Ave | |
| Altoona, Pennsylvania 16601 | |
| | |
| UNIVERSITY OF PITTSBURGH MEDICAL | |
| CENTER | |
| 200 Lothrop St. | |
| Pittsburgh, Pennsylvania 15213 | |
| | |
| Defendants. | |

2

## COMPLAINT

Plaintiff-Relators William Hennessey, MD, the Altoona Area School District ("AASD"), and Patrick Reilly, (collectively referred herein as "Relators"), by and through undersigned counsel, file this *qui tam* Complaint against Defendants University of Pittsburgh Medical Center ("UPMC") and University of Pittsburgh Medical Center Altoona ("UPMC Altoona") (collectively referred herein as "Defendants"), and allege as follows:

### I.    NATURE OF THE ACTION

1.    This case seeks to recover damages and civil penalties on behalf of the United States of America, and the Commonwealth of Pennsylvania (collectively the "Government"), arising from Defendants' violations of the Federal False Claims Act, 31 U.S.C §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986) ("the FCA"), and the corresponding state anti-fraud statute, 62 Pa. C.S. § 1407 (West 2022).

2.    This action arises out of Defendants' scheme to defraud the federal and state governments by falsely upcoding emergency room ("ER") visits to reflect more expensive levels of care than was provided for each patient. The UPMC hospital system engaged, and continues to engage, in upcoding to receive higher reimbursement from government programs like Medicare and Medicaid.

3.    Specifically, UPMC improperly submitted codes, referred to as Current Procedural Terminology ("CPT") codes, for more severe care than was rendered and for mislabeled patient symptoms in order for UPMC to receive a higher reimbursement from the government. For instance, UPMC routinely billed for ER visits under expensive CPT codes reflecting ER Levels 4 or 5, rather than the less expensive CPT codes reflecting ER Levels 1, 2, or 3.

3

4. ER visits are categorized into five levels of care. The lower levels (1, 2, or 3) are assigned for less serious ER visits while the higher levels (4 or 5) are assigned for severe problems indicating "threat of life" accompanied by high complexity medical decision making that require urgent evaluation and ER care.

5. UPMC routinely billed Medicare and Medicaid for Level 4 or 5 for patients that showed signs of low-risk health conditions, such as sore throats, ear infections, dizziness, and back pain. These non-severe patient conditions should have been billed as Levels 1, 2, or 3.

6. In 2020, UPMC recorded a total of over 450,000 ER visits in about eight Pennsylvania locations. The most frequently used code at UPMC was either 99284 or 99285, which reflected ER visits billed at Levels 4 or 5, that should have been billed for as Levels 1, 2, or 3. As a result, at least $180 million in overcharges were associated with ER Level 4 or 5 visits that year.

7. UPMC more commonly used procedure codes 99284 or 99285 than CPT codes 99281-99283, which reflected low complexity visits. UPMC coded the ER visits as high as they could so that the facility could receive a higher reimbursement rate.

8. To conceal the fraud, UPMC misrepresented patient diagnoses by documenting ambiguous and misleading patient symptom codes to skirt medical billing software scrutiny and maximized claim payments associated with the intentional upcoding. In addition, UPMC deliberately used a combination of codes that described signs and symptoms rather than a single code that described a definitive diagnosis in order to maximize billing.

9. Relator Dr. Hennessey first discovered UPMC's fraud when he came across data provided by Relator AASD, a Pennsylvania school district that hired Dr. Hennessey to review their self-funded health care plan. AASD had noticed high costs associated with ER claims submitted

by their plan sponsors who received care at UPMC. A vast majority of AASD plan members received care from UPMC Altoona and submitted claims to AASD for reimbursement.

10. Upon reviewing medical records and billing information for AASD plan members, Dr. Hennessey discovered that UPMC Altoona overcharged AASD with upcoded ER claims submitted to the public school district. Accordingly, UPMC Altoona caused AASD to overpay for upcoded claims submitted for inflated ER service levels.

11. Dr. Hennessey realized that the upcoding was not exclusive to UPMC Altoona. In fact, it was representative of a broader pattern of widespread upcoding fraud that occurred throughout all of the UPMC ER locations.

12. Since at least 2017, UPMC hospitals have steadily defrauded the federal and state governments out of hundreds of millions of dollars through systematic upcoding and related fraud, particularly for ER visits. By doing so, UPMC violated the federal FCA and the corresponding state statute. Upcoding ER claims at UPMC has been one of the most expensive and pervasive examples of healthcare fraud that occurred throughout the UPMC health system.

13. In addition, UPMC Altoona knowingly engaged in the fraud schemes alleged to cause public self-funded plans to overpay for ER services. UPMC Altoona took advantage of the federal, state, and local revenues that funded AASD and its employees (plan members) to defraud the public school system.

14. AASD alleges common law claims of fraud, negligent misrepresentation, unjust enrichment, as well as unfair or deceptive acts or practices prohibited by the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. C.S. § 201-1, *et seq.* (West 2022), against UPMC Altoona.

15.     If the United States Government, Pennsylvania, and AASD had been aware that UPMC hospitals routinely submitted false claims pertaining to upcoded ER levels for higher reimbursement, they would have rejected the claims and refused to pay them.

16.     The fraud continues to occur at the time of filing this Complaint. Defendants' fraud has damaged, and continues to damage, the government, and caused the government to pay hundreds of millions of dollars in overpayments throughout the entire UPMC health system. Relators report Defendants to stop the fraud, protect the patients at risk, and safeguard taxpayer dollars.

## II.     PARTIES

10.     The UNITED STATES, through the Department of Health and Human Services ("HHS") and HHS's Centers for Medicare and Medicaid Services ("CMS"), is the real party-plaintiff in interest in this action. HHS is located at 200 Independence Avenue S.W., Washington, D.C., 20201. CMS's main office is located at 7500 Security Boulevard, Baltimore, MD 21244.

11.     Relator William Hennessey, M.D. is the CEO and Founder of Pratter, Inc. ("Pratter"), a national medical cost savings, advocacy, and transparency company. Pratter offers various custom medical cost savings platforms to help employers drive down costs associated with employer-offered health benefits. Dr. Hennessey has practiced medicine in the Pittsburgh, Pennsylvania area for over two decades. In 2020, Dr. Hennessey became privy to UPMC Altoona's fraud after finding unusual patterns of inflated billing for the various types of ER services rendered to AASD plan members.

12.     Relator Altoona Area School District ("AASD") is one of Pennsylvania's largest school districts, with nearly 7,800 students. AASD has eight elementary schools, one junior high school, one high school, a secondary alternative education school and a Community Education

6

Center. AASD is the fourth largest employer in Blair County, Pennsylvania with approximately 1,200 district employees, of which 772 are on the school district's health insurance plan. AASD is the sponsor of one or more self-funded health plans to its district employees. AASD uses Cigna Healthcare as the national network that is accepted by UPMC. Trustmark is the third-party administrator ("TPA") for AASD's plans. District employees have access to Cigna's network of providers, which includes UPMC, UPMC Altoona, Allegheny Health Network, Geisinger, Conemaugh, Mount Nittany and Penn Highlands.

13. Relator Patrick Reilly is the founding partner of PeopleOne Health. A licensed insurance broker since 1988, Mr. Reilly previously worked as the Vice President of Sales and Development for the P&A Group, a national employee benefit consulting and administration company before forming his own consulting company in 2007. In the past, he was a certified faculty member at Lorman Education Services, which provides continuing education credits for brokers, accountants, attorneys, and human resources staff serving the health insurance industry. Patrick holds licenses in New York and Pennsylvania. Mr. Reilly has served as a health care consultant to AASD for at least five years and could speak to the allegations related to UPMC Altoona.

14. Defendant UPMC is a $23 billion integrated global nonprofit health enterprise organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business in 200 Lothrop St. Pittsburgh, Pennsylvania 15213. UPMC has 92,000 employees, forty hospitals with more than 8,000 licensed beds, 800 clinical locations, including outpatient sites and doctors' offices, a 3.8-million-member health insurance division, as well as commercial and international ventures.

15.    Defendant UPMC Altoona is a nonprofit, private community hospital provider organized under the laws of Pennsylvania, with its principal place of business in 620 Howard Ave, Altoona, Pennsylvania 16601. Since February 2013, UPMC Altoona has been a part of the national UPMC health care system. UPMC Altoona contains more than twenty affiliated health care companies and functions as the regional referral center of UPMC.

16.    UPMC Altoona operates a 380-bed acute-care teaching hospital, several outpatient centers, a surgery center, and a large local network of health care providers covering over twenty different specialties, with locations across six Pennsylvania counties. Medical services offered by UPMC Altoona include, emergency medicine, imaging services, cancer care, neurosurgery, trauma service, and telemedicine. The hospital also includes an adult Level II trauma center for the twenty-county region in central Pennsylvania. It is served by 300 physicians and 4,000 caregivers who provide a variety of medical services and specialties. It is the second highest designation for the level of medical care, providing 24-hour immediate coverage for all emergency services.

## III.    JURISDICTION AND VENUE

17.    Relators bring this action on behalf of themselves and on behalf of the United States pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (conferring federal subject matter jurisdiction) and 31 U.S.C. § 3732 (conferring jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3730 and 3732).

19.    There has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. *See* 31 U.S.C. § 3730(e)(4). To the extent there has been any public disclosure unknown to Relators, they are an original source under the FCA. *Id.*

20. This Court has personal jurisdiction over the Defendants under 31 U.S.C. § 3730(a), which authorizes nationwide service of process. In addition, the Defendants have at least minimum contacts with the United States.

21. Venue is proper in the District of Maryland, pursuant to 31 U.S.C § 3732(a), and 28 U.S.C. §§ 1391(b) and 1395(a) because CMS, the federal agency that administers Medicare and works in partnership with state governments to administer Medicaid, is headquartered in Baltimore, Maryland.

22. This Court has pendent jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.

23. Relators have insider knowledge of the information contained in this Complaint. The government would not have known about this fraud, its details, and its breadth and scope, without the Relators' personal knowledge. Relators pre-disclosed the facts giving rise to these claims to the Government before filing suit.

## IV. APPLICABLE LAW

### A. The False Claims Act

24. The Federal False Claims Act was originally enacted in 1863 and was substantially amended in 1986 by the False Claims Amendments Act, Pub. L. 99-562, 100 Stat. 3153. After finding that federal program fraud was pervasive, Congress enacted the 1986 amendments to enhance and modernize the Government's tools for recovering losses sustained by frauds against it. The amendments created incentives for individuals with knowledge of Government frauds to disclose the information without fear of reprisals or Government inaction. The amendments also encouraged the private bar to commit resources to prosecuting fraud on the Government's behalf.

25. The FCA provides, in pertinent part, that any person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent Claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false Record or statement material to a false or fraudulent claim;

(a)(1)(C) conspires to commit a violation of subparagraph (A), (B), or (G); or

[…]

(a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

[…]

is liable to the United States for any civil penalty, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104-401), [which is currently not less than $12,537 and not more than $25,076] plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(b).

26. For purposes of the FCA, the terms "knowing" and "knowingly" mean that a person, with respect to information: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and requires no proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1)(A)-(B).

27. The FCA defines a "claim" to include any request for money or property paid to a contractor, grantee, or other recipient with which the Government provides a portion of the money requested, or if the Government reimburses the contractor, grantee, or other recipient for any portion of the money or property requested. 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

28. Stated differently, indirect FCA liability is supported by the FCA's definition of a "claim," which includes any request or demand for money or property made to a contractor,

grantee, or recipient, if the money or property is: 1) to be spent or used on the government's behalf, or to advance a government program or interest; and 2) paid for or reimbursed by the government.

29.     The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

30.     The FCA contains an independent requirement to correct errors that will cause, or have caused, a government overpayment. The FCA attaches liability to anyone who knowingly makes, uses, or causes to be made or used, a false statement or record material to an obligation to pay or transmit money to the government, or who knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the government. 31 U.S.C. § 3729(a)(1)(G).

31.     The FCA allows any person having information about false or fraudulent claims to bring an FCA action, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days.

### B. The Pennsylvania Anti-Fraud Statute

32. Under Pennsylvania law, (a) it is unlawful for any person to:

    (1) Knowingly or intentionally present for allowance or payment any false or fraudulent claim or cost report for furnishing services or merchandise under medical assistance, or to knowingly present for allowance or payment any claim or cost report for medically unnecessary services or merchandise under medical assistance, or to knowingly submit false information, for the purpose of obtaining greater compensation than that to which he is legally entitled for furnishing services or merchandise under medical assistance, or to knowingly submit false information for the purpose of obtaining

11

authorization for furnishing services or merchandise under medical assistance;

[...]

(4) Submit a claim for services, supplies or equipment were not rendered to a recipient;

(5) Submit a claim for services, supplies or equipment which includes costs or charges not related to such services, supplies or equipment rendered to the recipient;

(6) Submit a claim or refer a recipient to another provider by referral, order or prescription, for services, supplies or equipment which are not documented in the record in the prescribed manner and are of little or no benefit to the recipient, are below the accepted medical treatment standards, or are unneeded by the recipient; or

(7) Submit a claim which misrepresents the description of services, supplies or equipment dispensed or provided; the dates of services; the identity of the recipient; the identity of the attending, prescribing or referring practitioner; or the identity of the actual provider.

*See* 62 Pa. C.S. § 1407 (West 2022).

### C. The Medicare Program

33.    Medicare, enacted in 1965 under Title XVIII of the Social Security Act, is a third-party reimbursement program that underwrites medical expenses of the elderly and the disabled. 42 U.S.C. § 1395. Medicare reimbursements are paid from the federal Supplementary Medical Insurance Trust Fund.

12

34.    Medicare Part A covers hospital services and related care. Medicare Part B generally covers physician services, including ER visits, outpatient treatment and diagnosis. 42 U.S.C. § 1395j. Physicians, non-physician practitioners, and other healthcare providers must enroll in the Medicare program for eligibility to receive Medicare payment for covered services provided to Medicare beneficiaries. 42 C.F.R. § 424.505.

### 1. Medicare Part B

35.    Medicare Part B usually covers emergency department services for an injury, a sudden illness, or an illness that quickly gets much worse.

36.    Medicare typically charges a copay for each ER visit and copays for hospital services during the visit. In addition to the copays, a patient may also need to pay a coinsurance for doctor services rendered in the ER.

37.    Medicare pays 80 percent of the Medicare-approved amount for doctor services.

### 2. Medicare Contracts and Claims Submission

38.    Medicare reimburses healthcare providers for the reasonable costs of providing covered health services to Medicare beneficiaries. 42 U.S.C. § 1395x(v)(1)(A).

39.    To bill Medicare Part B, a provider must submit an electronic or hard copy claim form called the CMS 1500 to the appropriate private insurance company, also known as a Medicare carrier. This form describes, among other things, the provider, the patient, the referring physician, the service (s) provided by procedure code, the related diagnosis code(s), the dates of service, and the amount charged. In addition, each Medicare provider must sign a provider agreement and agree to comply with all Medicare requirements including the fraud and abuse provisions.

40.    A provider who fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicare patients.

41.    At all times relevant to this action involving UPMC, the local carriers that reviewed and approved the claims at issue in this case based their review upon the enrollment information and claim information provided by UPMC hospitals and relied on the veracity of the information in determining whether to pay the claims submitted by the providers.

42.    As a prerequisite to payment, Medicare also requires providers to submit Form CMS-2552-10, commonly known as the Hospital Cost Report. Cost Reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

43.    Every Hospital Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator. Through this certification, the provider confirms that the cost report is "a true, correct and complete statement" and the services identified "were provided in compliance with [the laws and regulations regarding the provision of the health care services]."

44.    Medicare, often through its Medicare Administrative Contractor, has the right to audit a provider hospital's cost reports and financial representations to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right includes the right to make retroactive adjustments to hospital cost reports for any overpayments. 42 C.F.R. § 413.64(f).

### 3.  Medical Necessity

45.    Federal statute expressly limits Medicare reimbursements to items and services that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A); *see also* Title XVII of the Social Security Act, § 1862(a)(1)(A). Each of the state Medicaid programs have similar restrictions on reimbursement.

46.    Coverage determinations are made in several ways. First, the HHS Secretary may issue binding guidance, such as a National Coverage Determination ("NCD"). Second, a Medicare contractor may issue its own guidance, which is known as a Local Coverage Determination ("LCD"), which applies to a specific geographic region. Third, if neither an NCD nor an LCD exists, a Medicare contractor makes an individual determination on whether the service is covered. The contractor decides whether the service falls within a Medicare benefit category and is "reasonable and necessary for the diagnosis or treatment of illness or injury."

47.    When making an individual determination, the Medicare contractor also relies on the strongest evidence of medical necessity available, including but not limited to:

- Published authoritative evidence derived from definitive randomized clinical trials or other definitive studies, and

- General acceptance by the medical community (standard of practice), as supported by sound medical evidence based on:

  - Scientific data or research studies published in peer-reviewed medical journals;

  - Consensus of expert medical opinion; or

  - Medical opinion derived from consultations with medical associations or other health care experts.

*See* Medicare Program Integrity Manual (MPIM) § 13.7.1 (Rev. 863, 02-12-19).

48.    At all times relevant to this action, UPMC routinely bolstered claims by listing irrelevant diagnoses (often medically unnecessary) that had little to do with the reason for the patient's presented symptoms.

**D. The Medicaid Program**

15

49.    Medicaid is a public assistance program providing for payment of medical expenses for low-income and disabled patients. Funding for Medicaid is shared between the Federal Government and the states participating in the program.

50.    Federal regulations require each state to designate a single state agency responsible for the Medicaid program. The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the HHS Secretary. Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines.

51.    Each provider that participates in the Medicaid program must sign a provider agreement with their respective state.

52.    In all material respects, Medicaid generally follows Medicare as to medical necessity.

### E.  General Coding and Billing Guidelines for Emergency Department Services

53.    ER services are coded based on a scale ranging from Levels 1 to 5 that reflect the complexity of care for the individual patient. Every ER visit is given a level of severity. Generally, the levels correspond as follows:

- Level 1 – A limited, minor problem that will run its course on its own;
- Level 2 – A limited, minor problem with no risk for death, and is not likely to permanently alter a patient's health status;
- Level 3 – A problem where risks are low, and full recovery is expected, but there may be some small risk of problems developing if the patient doesn't receive treatment;
- Level 4 – A severe problem that requires urgent evaluation, but does not pose a threat to life or to physical function; without treatment there is a high chance of extreme impairment; and
- Level 5 – An immediate, significant threat to life or physiological functioning.

54.    Each level is associated with a CPT code that determines the cost of care charged to insurance plans as well as to Medicare and Medicaid. The five levels of ER services are represented by CPT codes 99281, 99282, 99283, 99284, and 99285 respectively. The codes require

three key components (history, examination, and medical decision-making) to be met and documented for the level of service selected.

55.     The criteria set forth is per the American Medical Association ("AMA") current CPT manual. Following the guideline, the two most significant criteria to bill for an ER Level 5 requires a "threat of life" and/or "complex medical decision-making."

56.     Below is a chart that depicts the different levels of service, the corresponding CPT codes, and the three key components required for the coding criteria:

| Levels of Service | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|---|
| **CPT Code** | 99281 | 99282 | 99283 | 99284 | 99285 |
| **History** | Problem Focused | Expanded Problem-Focused | Expanded Problem-Focused | Detailed | Comprehensive |
| **Physical Exam** | Problem Focused | Expanded Problem Focused | Expanded Problem Focused | Detailed | Comprehensive |
| **Medical Decision** | Straightforward | Low | Moderate | Moderately High | High |

57.     Medical records and documentation must clearly identify and support the billed codes. CMS notes that clear and concise medical record documentation is critical to providing patients with quality care and is required for the provider to receive accurate payment for furnished services. *See* CMS Evaluation and Management Services Guide, January 2022.

58.     The level of service billed must be based on the performed intervention(s) in relation to the medical care required by the presenting symptoms, resulting in a diagnosis for the patient. Professional codes are based on complexity and performed work, which includes the cognitive effort. *Id.*

## V.   FACTUAL ALLEGATIONS

### A. UPMC Hospitals Upcoded ER Visits and Submitted False Claims to Receive Higher Reimbursement

59.   Since at least 2017, UPMC hospitals routinely engaged in improper ER billing fraud and directly defrauded government-funded programs, including Medicare and Medicaid.

60.   UPMC owns approximately 40 hospitals. The hospitals operate under a centralized billing system, which allows for all UPMC hospitals to surreptitiously engage in upcoding by deliberately inflating ER levels and falsely billing the government for higher reimbursement.

61.   UPMC operates emergency rooms throughout Pennsylvania, including Southwest Pennsylvania, Northwest Pennsylvania, Central Pennsylvania, North Central Pennsylvania, West Central Pennsylvania, as well as in Western New York, and in Western Maryland.

62.   In 2017, UPMC hospitals billed over 70% of their Medicare patients for the two most expensive levels of treatment in the emergency room. As depicted by the chart created by Dr. Hennessey below, UPMC more commonly billed its Medicare patients at either Levels 4 or 5.

| UPMC ER Code | Description | # of claims | % of claims |
|---|---|---|---|
| 99281 | Level 1 visit | 3701 | 5.6% |
| 99282 | Level 2 ER visit | 4181 | 3.0% |
| 99283 | Level 3 ER visit | 30759 | 22.0% |
| 99284 | Level 4 ER visit | 60688 | 43.5% |
| 99285 | Level 5 ER visit | 40267 | 28.8% |

Medicare total
2017 -
139,596 ER
claims

18

63.     However, most of those cases reported the patients' conditions as non-life-threatening, and thus, did not warrant a Level 4 or 5 ER visit. In fact, in 2017, 87% of those Medicare patients were reported to be discharged.

64.     In other words, UPMC hospitals billed over 70% of their Medicare patients as Levels 4 or 5, suggesting that these Medicare patients were subject to severe urgent care and/or showed a significant threat to life, even though their history, symptoms and/or medical decision-making component did not warrant the Levels 4 or 5 ER visit. 87% of those Medicare patients were reported to be discharged.

65.     According to a 2020 report compiled by the Pennsylvania Department of Health, at least 8 UPMC hospitals and affiliated facilities reported over a total of 450,000 ER visits.

**Pennsylvania Department of Health - Division of Health Informatics**
**Data from the Hospital Questionnaire**
**Reporting Period: January 1, 2020, through December 31, 2020**
**Report 4**
**Emergency Services Capability and Utilization by Facility and County**
**Excluding Federal Hospitals**

| FACILITY NAME | ER CAPABILITY | VISITS TO ER |
|---|---|---|
| UPMC CHILDREN'S HOSPITAL OF PITTSBURGH | COMPREHENSIVE | 55,590 |
| UPMC EAST | GENERAL | 35,417 |
| UPMC MAGEE WOMENS HOSPITAL | GENERAL | 22,709 |
| UPMC MCKEESPORT | GENERAL | 26,470 |
| UPMC MERCY | COMPREHENSIVE | 49,617 |
| UPMC PASSAVANT | GENERAL | 53,456 |
| UPMC PRESBYTERIAN SHADYSIDE | COMPREHENSIVE | 92,570 |
| UPMC ST MARGARET | COMPREHENSIVE | 30,205 |

66.    Applying Dr. Hennessey's findings for UPMC Altoona to the calculation provided above, which is provided later in this Complaint, Dr. Hennessey estimates that the use of the top expensive codes for ER visits were common for Medicare and Medicaid patients at UPMC hospitals, with the hospitals overbilling at least 55% of their ER visits at Levels 4 or 5, even though on average, only 13% of the patients at each hospital were admitted for life-threatening conditions.

67.    Upon information and belief, each time UPMC billed the government for an upcoded ER visit, Medicare or Medicaid overpaid up to $800 for each claim.

68.    Given that more than half of all ER claims were coded as a "threat of life" Level 5 visit in 2020, it is estimated that UPMC billed at least 225,000 out of the 450,000 ER visits as Levels 4 or 5.  As a result, UPMC overcharged the government at least $180 million in 2020.

69.    Taking advantage of its monopoly status, UPMC hospitals have systemically upcharged patients at the outset, further increasing the reimbursement amount billed to the government.

70.    For example, UPMC upcharged patients for ER visits at a higher rate than the rates charged for ER visits by non-UPMC providers. The chart prepared by Dr. Hennessey demonstrates the delta between the costs associated with ER visits at UPMC Altoona and non-UPMC facilities.

### ER Level Costs UPMC Vs. Non-UPMC

| ER Cost | Non-UPMC | UPMC |
| --- | --- | --- |
| Average ER Cost | $748 | $896 |
| Average ER Level 3 Cost | $359 | $472 |
| Average ER Level 4 Cost | $671 | $673 |
| Average ER Level 5 Cost | $1,169 | $1,327 |
| Avg. Savings Per Visit | | |

71.   Dr. Hennessey understands that UPMC has increased ER Medicare billing in the last ten years. However, UPMC's rates (price per item) for ER visits are not publicly available.

72.   Thus, there is no way for the patient to accurately determine the charges applied to his or her ER visit, let alone figure out whether UPMC upcoded ER claims to reflect a more expensive procedure code submitted to Medicare or Medicaid for higher reimbursement.

73.   On the occasion that the patient questions their ER billing methods, UPMC deliberately fails to respond to the patient's requests for an itemized bill. Instead, UPMC hospitals color code their invoices in red to threaten the patient and send a message that if the bill is not paid, the charges will be immediately processed to collections.

74.   As a representative example, on or about June 9, 2021, Dr. Hennessey discovered that UPMC misquoted a charge on his bill for a regular office visit. Despite Dr. Hennessey's efforts to speak to UPMC about the upcharges, not one individual at UPMC could answer his questions about the upcharges. Eventually, UPMC offered Dr. Hennessey a form of credit but refused to explain how the upcharges had been calculated.

75.   At all times relevant to the allegations presented in this Complaint, UPMC covertly and methodically defrauded the government by upcoding ER visits and maximizing its own revenues at the expense of taxpayers' dollars.

76.   It was easy to perpetrate the fraudulent scheme, because UPMC operated, and continues to operate a centralized billing system that handled the submission of claims, throughout all of its locations.

77.   By engaging in the fraudulent scheme, UPMC hospitals violated the federal FCA and the corresponding state statute.

### B. UPMC Made False Statements in Patient Medical Records with the Intention to Mislead

21

78. UPMC facilitated the fraudulent upcoding by making false statements in patient medical records, comprised of misleading and ambiguous symptoms rather than specific diagnoses.

79. Specifically, UPMC used various combinations of billing codes that defined ambiguous patient symptoms, such as dizziness, fatigue, giddiness, myalgia, or chest pain, instead of a definitive diagnosis.

80. Documentation of such patient symptoms failed to support the assessment that a patient required a Level 4 or 5 ER visit that indicated a "threat of life" or needed severe urgent care.

81. However, UPMC deliberately reported misleading and ambiguous symptoms to skirt medical billing software scrutiny, then billed for the two most expensive codes that reflected ER visits billed at Levels 4 or 5, that should have been billed for as Levels 1, 2, or 3, and then discharged the patient from the hospital.

82. For example, if symptoms of heart burn had been properly coded as a diagnosis code reflecting heart burn, an above-board hospital would typically bill for heart burn as a Level 3 at the most. Should a provider bill for anything higher for the heart burn, any properly running billing software could detect the upcharge and prevent the provider from receiving reimbursement for the more expensive codes.

83. To prevent detection, UPMC deliberately used numerous codes reflecting various symptoms to demonstrate heartburn. This included chest pain, difficulty swallowing, and a burning sensation in the throat. All of these symptoms directly correlated to separate billing codes, instead of one diagnosis code for heart burn, which permitted UPMC to set the stage for billing the ER visit at the most expensive levels.

84.     In addition, UPMC filled the patient medical records with incomplete and vague symptoms that ultimately led to UPMC billing for Level 4 or 5 ER care, accompanied by documentation that noted that the patient demonstrated stable vital signs.

85.     To be clear, a patient who is subject to threat of life under Level 4 or 5 ER care would not maintain stable vital signs.

86.     UPMC knew that the false statements made in patient medical records were material to the payor reviewing the claims submitted to Medicare or Medicaid for reimbursement. UPMC documented false statements in patient records to maximize claim payments associated with upcoding.

87.     Since at least 2017, UPMC failed to ensure proper utilization of ER visits and provided over-documentation of patient symptoms to support the false billing.

88.     Through a carefully crafted system that included misleading and ambiguous descriptions of symptoms that reflected numerous billing codes, rather than one, single definitive diagnosis code, UPMC submitted false claims for excessive ER services that were neither reasonable nor medically necessary, but also billed for services not rendered.

89.     Had the federal and state governments known of UPMC's ongoing fraudulent conduct, they would not have been exposed to overpayments. UPMC's misconduct interfered with the governments' duties to make informed decisions on behalf of its beneficiaries to best use tax dollars funding Medicare and Medicaid.

### C. How Dr. Hennessey Discovered Fraud at UPMC

90.     In or about 2020, AASD hired Dr. Hennessey to review tens of thousands of medical bills paid by AASD and perform an analysis that examined the drivers of claims cost growth for the school district's self-funded plans.

91. Dr. Hennessey's review led to two critical discoveries after comparing the medical records of AASD plan members against their billing records to determine and quantify any upcharges.

92. First, Dr. Hennessey identified ER visits as the top cost driver of AASD's health care plans offered to its district employees.

93. Second, Dr. Hennessey discovered that the number of claims associated with Level 5 ER visits were significantly disproportionate to the number of claims associated with Levels 1, 2, 3, or 4 ER visits for UPMC specifically.

### 1. Background: AASD Insures its School District Employees Through Self-Funded Health Plans

94. AASD is a Pennsylvania public school district charged with educating school-aged children residing in Blair County. AASD has a total school-age population of approximately 7,800 students and is made up of more than 59,000 residents.

95. AASD receives funding from a combination of federal, state, and local government resources. A major portion of the public-school district's budget comes from state resources, including income taxes, sales taxes, and fees. Another portion comes from local contributions, primarily through the local property taxes of homeowners in the area. AASD also receives funding from federal sources, with an emphasis on grants for specific programs and services for students on an as-needed basis.

96. As the fourth largest employer in Blair County, Pennsylvania, AASD employs approximately 1,200 employees.

97. AASD offers self-funded health plans to its school district employees, utilizing Cigna Healthcare as the main network provider and Trustmark as the TPA. AASD pays claims

submitted to these plans out of their own assets, which are funded by the federal, state, and local governments.

98.     As the plan sponsor, AASD has the fiduciary responsibility and discretion to administer claims (through Trustmark) under the plans and to ensure that all aspects of its operations are cost effective in proportion to the taxpayer dollars expended.

99.     AASD worked to keep health care costs low for its plan members by factoring long-term costs to structure their plans in a way that would avoid rate increases for future school years. To that end, AASD regularly issued Request for Proposals ("RFPs") for claims billing services.

100.     Prior to the 2019-2020 school year, AASD utilized UPMC as the TPA and primary source for health insurance related services.

101.     In or about 2019/early 2020, AASD considered working under a reference-based pricing model ("RBP"), which is a method used to pay claims based on an established benchmark rather than based on a carrier-determined fee. In other words, under the RBP, employers' health care costs are set based on reference prices, rather than arbitrary, illegally hidden pricing from UPMC. RBP is more common in self-funded health plans, as it eliminates a significant amount of potential billing fraud and overpayment to medical providers but adds a fair profit margin for the provider.

102.     At the beginning of the RBP transition process, AASD reached out to UPMC to collect information about the services that the hospital rendered for its employees.

103.     However, UPMC did not want AASD to use RBP because it was a more transparent approach that prevented UPMC from charging AASD with hidden costs for care. Dr. Hennessey is aware of UPMC sending letters to employers stating that employers with RBP plans are not welcome at UPMC hospitals, even when the necessary care can only be provided by UPMC.

104.   Shortly thereafter, UPMC began to refuse care for AASD-covered district employees that did not have insurance coverage through the UPMC Health Plan or through Blue Cross Blue Shield, UnitedHealth, Cigna, or Aetna.

105.   These challenges forced AASD to look for other network providers, and ultimately, AASD contracted with Cigna Healthcare, which allowed AASD district employees to seek care at UPMC hospitals, including UPMC Altoona.

106.   For the 2020-2021 school year, AASD covered 772 district employees under its self-insured health plans. As the plan sponsor, AASD directly paid for all medical costs for its IRS qualifying High Deductible Health Plan ("HDHP").[1]

107.   The HDHP is a health insurance plan with a deductible of at least $1,500 for an individual plan; or a deductible of at least $3,000 for a family plan. The deductible is the amount that school district employees paid out-of-pocket for medical expenses before AASD pays for the costs. Notably, the plan's out-of-pocket limit is not higher than $7,500 for an individual plan or $15,000 for a family plan. The out-of-pocket limit is the most that each district employee must pay in a year for medical expenses covered by the AASD self-insured health plan.

108.   However, during the 2020-2021 school year, AASD saw an increase in total health care costs of over $1,000,000 and became concerned with the rising costs.

109.   AASD consulted with Dr. Hennessey to discuss cost containment measures for its plans. As an initial matter, Dr. Hennessey recommended that AASD plan members utilize in-network, more cost effective, non-UPMC facilities for routine outpatient care. This approach helped AASD curb costs and provided various financial incentives for AASD plan members.

---

[1] AASD directly paid for all medical costs, with the exception of a spousal inclusion cost at a rate of $1,200 per year.

110. However, during this process, Dr. Hennessey noticed a greater issue related to the number of Level 5 ER visits attributed to the high costs of AASD's plan.

### 2. Dr. Hennessey's Discovery of UPMC Altoona Upcoding Claims Submitted to AASD

111. To address AASD's concerns with the rising health care costs associated with the care provided to its plan members, Dr. Hennessey conducted a review of the medical billings for ER care provided to AASD plan members by UPMC Altoona.

112. Dr. Hennessey became immediately alarmed by his findings.

113. First, Dr. Hennessey discovered that the top cost driver of AASD's health plan was attributed to ER visits. Second, upon further analysis, Dr. Hennessey suspected that UPMC Altoona deliberately inflated ER levels to upcharge AASD.

114. The rate at which UPMC Altoona submitted claims to AASD by improperly utilizing CPT codes 99285 and 99284 was far too high to have been unintentional. It exceeded the error rate that Dr. Hennessey observed among other providers for such claims.

115. In addition, the degree to which many of the claims at issue clearly warranted lower CPT codes foreclosed the possibility that the upcoding occurred by error.

116. Moreover, no coding professional would have applied CPT codes 99285 and 99284 to these claims unless instructed to do by UPMC, contrary to the proper use of those CPT codes.

117. To conduct a more comprehensive review, Dr. Hennessey sought to compare the billing information to patient records. He focused the review on claims billed for ER services utilizing the 99284 and 99285 CPT codes. Dr. Hennessey wanted to confirm that the information provided in an AASD plan member's medical record warranted the Level 4 or 5 ER care that UPMC Altoona billed for.

118.    In or about September 2021, AASD submitted a request to UPMC Altoona for medical records of the AASD health plan members and their dependents. Dr. Hennessey and AASD sought to confirm the accuracy of the claims associated with the ER services rendered to AASD district employees at UPMC Altoona.

119.    In the request, AASD specifically asked for ER medical records, including but not limited to, physician orders, physician notes, nursing notes, lab and test results, and discharge summaries. For those admitted to the hospital, AASD asked for ER medical records that included patient medical histories, and daily progress notations.

120.    UPMC Altoona did not respond to AASD's requests, even though they were required to provide this information and the request was compliant under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

121.    On or about October 12, 2021, AASD followed-up on its request via e-mail to UPMC Altoona.

122.    On or about October 13, 2021, UPMC Altoona emailed AASD and asked the school district to call the hospital's records department for more information.

123.    That same day, Ms. Camilla Houy, Business Manager and Compliance Officer for AASD, called the UPMC Altoona Medical Records Department and learned that AASD's request was "on someone's desk", waiting for AASD to provide birthdates of the plan members. To be clear, AASD had not received any calls and/or e-mails from UPMC Altoona, asking for follow-up information regarding AASD plan members until AASD had reached out on October 12, 2021.

124.    Nevertheless, per UPMC Altoona's request, AASD provided the birthdates of its plan members on October 14, 2021. AASD also conveyed to UPMC Altoona that the medical

records related only to members or beneficiaries sponsored by AASD, indicating that AASD was entitled to the information.

125. However, UPMC Altoona again failed to provide the requested medical records.

126. Instead, UPMC Altoona suddenly required separate releases from each individual plan member claiming that the plan members did not have a relationship with AASD and suggested that Cigna would have to acquire the medical records of UPMC and provide them to AASD. UPMC Altoona continued to refuse to provide the ER medical records.

127. UPMC Altoona argued that the plan members had a contractual relationship with Cigna because Cigna processed the claims. Cigna served as the claims network through Trustmark as AASD's TPA. AASD is the payor. AASD paid the ER claims for its plan members.

128. Requiring individual patient/plan member approval and representing that Cigna, the network provider, had to request AASD plan members' medical records are false statements made by UPMC Altoona.

129. Finally, after experiencing several months of UPMC Altoona's pattern of delay and obstruction, AASD filed a formal complaint with the Pennsylvania Office of the Attorney General on January 2, 2022, at the recommendation of Dr. Hennessey. AASD stated in the complaint that it was entitled to obtain ER records for its plan members pursuant to the applicable HIPAA provisions.

130. UPMC responded to AASD's requests, and on January 25, 2022, UPMC Altoona provided the requested ER medical records for AASD plan members. This admission by UPMC Altoona only occurred after AASD filed a formal complaint with the Pennsylvania Office of the Attorney General.

131. Upon information and belief, UPMC Altoona and UPMC attempted to obstruct AASD's access to the plan members' medical records because it knew that the patient symptoms recorded in the medical records would not support the purported life-threatening Level 5 ER visits that UPMC Altoona billed AASD for.

132. In or about February 2022, Dr. Hennessey reviewed UPMC Altoona's Level 5 ER medical records for AASD plan members against the ER billing invoices.

133. Dr. Hennessey had initially learned prior to receiving the medical records that during the 2020-2021 school year, UPMC Altoona had reported a total of 88 ER Level 5 claims, which required a "threat of life" accompanied by a complex medical decision-making assessment of the patient.

134. However, the corresponding ER medical records demonstrated that almost all the patients that UPMC Altoona had billed for as an ER Level 5 claim did not qualify as a high level of risk, let alone require urgent medical intervention.

135. In fact, only one out of the 88 Level 5 claims indicated a serious medical condition that warranted Level 5 ER care. Specifically, UPMC Altoona had documented 97% of the ER Level 5 visits with stable vital signs for the patients, which indicated that the patients did not have any life-threatening medical issues, even though only 1% had a serious abnormal examination finding that was properly billed for as a Level 5 ER visit.

136. In addition, an alarming amount of supporting documentation for the ER Level 5 visits also lacked a specific diagnosis. Patient reports included low-risk symptoms such as abdominal pain or dizziness that did not warrant a Level 5 visit, let alone indicative of any serious "threat of life."

137.    In the following section, Relators provide representative patient examples that demonstrate UPMC Altoona's deliberate upcoding that led to the submission of false ER claims to AASD.

### 3.   Representative Patient Examples[2]

*Patient A*

138.    On July 14, 2020, a 44-year-old AASD plan member ("Patient A") received ER care at UPMC Altoona. Patient A had complained of right, lower back pain for three days.

139.    Level 5 care requires that all three components – the history, the physical exam, and medical decision-making – meet the respective maximum coding criteria. For the medical decision-making component, ER practitioners determines an extensive diagnosis, that requires laboratory testing and procedures, and some level of high-risk indicator in the patient symptoms to warrant Level 5 care for the patient.

140.    Patient A did not receive any definitive diagnosis for his condition, let alone an extensive one.

141.    Patient A's UPMC Altoona medical records stated that "**there was no trauma,** urinary complaints, urinary incontinence, focal weakness or numbness" (emphasis added).

142.    Other than the patient's presented symptoms of "right low back pain," the medical records did not provide any other relevant assessment, diagnosis, and/or treatment that warranted ER Level 5 care. In addition, the medical decision-making criteria indicated that Patient A's "Lumbar spine films [were] negative" and that he was "feeling much better after medication [was] given. Suspect muscular sprain and spasm."

---

[2] To protect patient confidentiality, patient names and/or dates of birth are not used in this Complaint. Redacted copies of the itemized medical patient records will be produced with the Relator's Statement provided to the government.

143. UPMC Altoona proceeded to discharge Patient A and noted that the patient was "stable" at the time of discharge.

144. Based on the information provided, Patient A did not require urgent intervention, yet UPMC Altoona charged AASD for Level 5 care and billed the care under CPT code 99285.

145. Billing for ER Level 5 under CPT code 99285 is the highest level of payment applied for ER services than claims with CPT codes denoting less serious ER visits, which in this case would have been more appropriate for a patient that complained of lower back pain.

146. Despite billing Patient A as a Level 5 ER visit, indicating a life-threatening condition, UPMC Altoona sent Patient A home.

**Patient B**

147. In another representative example, on September 20, 2020, a 42-year-old AASD plan member ("Patient B") complained of "shortness of breath,[3] nasal congestion, sore throat, fevers, and a cough."

148. At height of the COVID-19 pandemic, Patient B required evaluation by a physician (or other qualified health care professional) for potentially high-risk symptoms of "shortness of breath" and "fevers."

149. Upon evaluation, the medical decision-making section of Patient B's medical records reported that he "appear[ed] well on physical exam," and that he "ha[d] symptoms of a common cold or virus." UPMC Altoona determined that the patient had a "URI (upper respiratory infection) with mild bronchitis," which did not constitute a "threat of life" for purposes of an ER Level 5 visit.

---

[3] Some of the common problems of the patient coming for ER Level 3 visit include shortness of breath. Jitendra M.Sc CPC, *CPT code 99282: When to assign ED Level 3*, Medical Coding Guide (Apr. 23, 2019), https://www.americanmedicalcoding.com/ed-cpt-code-99283/.

150. UPMC Altoona proceeded to discharge the patient, noting his stable vital condition.

151. However, UPMC Altoona charged AASD for Level 5 care and billed the care under CPT code 99285 for this patient. UPMC Altoona would not have discharged the patient if the patient's conditions were life-threatening.

**Patient C**

152. As part of its multi-faceted scheme to defraud the government, UPMC Altoona routinely upcharged younger patients (dependents of AASD plan members) who generally displayed good health, according to their medical records.

153. On January 6, 2021, 18-year-old Patient C was admitted to UPMC Altoona.

154. Patient C qualified for AASD sponsored health care as the dependent eligible for coverage under a policyholder's (AASD plan member) health insurance.

155. ER practitioners evaluated Patient C for complaints of intermittent chest pains that had been ongoing for several weeks. Patient C did not complain of "any fevers, chills, cough, nausea, or diaphoresis."

156. UPMC Altoona determined that the "patient's cardiac work-up is unremarkable" and that "she [was] stable for discharge."

157. Without any extensive clinical evaluation, treatment, or a diagnosis, UPMC Altoona billed Patient C's evaluation as a Level 5 ER visit. Without medical reason, UPMC Altoona fraudulently billed the patient as a Level 5 so as to upcharge AASD.

**Patient D**

158. In another example involving a dependent of an AASD plan member, on October 25, 2020, a 10-year-old patient came to UPMC Altoona presenting "left ankle pain after playing football."

159. UPMC Altoona reported in Patient D's medical records that the patient had a "distal left tibia and fibula fracture" and showed "no other signs of acute injuries." UPMC Altoona determined that Patient D had an ankle fracture. An orthopedic treated the patient, noted "stable condition," and the hospital sent the patient home.

160. There was no indication that the patient's life was in danger. However, UPMC Altoona billed Patient D as a Level 5 ER visit.

161. The patient examples provided in this section demonstrate only a small sampling of the types of upcoded ER levels that caused AASD to overpay for false claims submitted by UPMC Altoona. There are hundreds of thousands of claims connected to UPMC hospital's improper use of the ER levels and the corresponding billing codes.[4]

162. During the 2020-2021 school year, UPMC Altoona reported a total of 88 Level 5 ER claims, indicating a threat of life for each of those patients.

163. However, Dr. Hennessey's review indicated that UPMC Altoona fraudulently upcharged the majority of the ER bills to Level 5 without any medical documentation warranting the high severity ER visit.

164. Dr. Hennessey provides a summary below of his findings related to the 88 claims, in which UPMC Altoona deemed as life-threatening situations that required Level 5 ER care.

---

[4] Relators obtain copies of the medical records and corresponding billing information for patient examples and will produce them with the Relator's statement.

|    | **KEY FINDINGS (2020-2021)** | **NUMBER OF CLAIMS** |
|----|------------------------------|----------------------|
| 1) | *Level 5 ER Visits* | 88 |
| 2) | *ER Admissions* | 24 |
| 3) | *Discharged Patients with Stable Vital Signs* | 85 |
| 4) | *Patients Diagnosed with Conditions that Did Not Demonstrate Immediate, Significant Threat to Life or Physiologic Functioning* | 85 |
| 5) | *High Complex Medical Decision-Making* | 4 |
| 6) | *Six or More Hours in the ER* | 1 |
| 7) | *Serious Examination Findings* | 1 |

165.    During the 2020-2021 school year AASD overpaid at least $70,000. AASD, funded by the government, would not have paid for the ER claims had it known that UPMC Altoona fraudulently inflated ER levels and submitted false claims to AASD.

166.    Since at least 2020 to the present, Dr. Hennessey estimates that AASD, funded by the federal, state, and local governments, incurred hundreds of thousands of dollars in overpayments. Upon information and belief, UPMC Altoona continues to inflate ER levels and overcharges AASD for those services.

167.    In some instances, where Medicare and/or Medicaid served as the secondary payer for costs not covered by the AASD (as the primary payor), Relators understand that UPMC's systemic fraud caused Medicare and/or Medicaid to directly overpay for the fraudulently inflated ER levels.

168.    The culture of corruption fostered by Defendants is improper and in direct contravention of the federal and state FCAs. The fraudulent upcoding is a representative pattern

35

of abuse that has been facilitated by UPMC since at least 2017. UPMC's centralized billing system allowed all of its locations to engage in upcoding and false billing at the expense of taxpayer dollars.

## COUNT ONE
### 31 U.S.C. §3729(a)(1)(A)
### (Alleged against Defendants)

169.  Plaintiff-Relators repeat and reallege each and every allegation contained herein.

170.  This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

171.  Defendants knowingly presented false claims, based on upcoded ER levels, for higher reimbursement.

172.  Specifically, UPMC improperly submitted codes, referred to as Current Procedural Terminology ("CPT") codes, for more severe care than was rendered and for mislabeled patient symptoms in order for UPMC to receive a higher reimbursement from the government. For instance, UPMC routinely billed for ER visits under expensive CPT codes reflecting ER Levels 4 or 5, rather than the less expensive CPT codes reflecting ER Levels 1, 2, or 3.

173.  Through the acts described above, the Defendants and their agents and employees knowingly defrauded the United States Government in order to obtain higher reimbursement for ER care at UPMC.

174.  FCA liability is supported by the FCA's definition of a "claim," which includes any request or demand for money or property made to a contractor, grantee, or recipient if the money or property is: 1) to be spent or used on the government's behalf, or to advance a government program or interest; and 2) paid for or reimbursed by the government.

175.    The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. *See* 31 U.S.C. § 3729(b)(4).

176.    The United States, unaware of the falsity of the claims made by the providers that were affected by the Defendants' misconduct, approved, paid, and participated in payments made by Medicare and Medicaid for claims that otherwise would not have been allowed.

177.    By reasons of these payments and approvals, the United States has been damaged, and continues to be damaged in an amount yet to be determined.

## COUNT TWO
### 31 U.S.C. § 3729 (a)(1)(B)
### (Alleged against Defendants)

178.    Plaintiff-Relators repeat and reallege each and every allegation contained herein.

179.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

180.    Defendants knowingly made false statements material to false claims, based on upcoded ER levels, for higher reimbursement.

181.    Specifically, UPMC improperly submitted codes, referred to as Current Procedural Terminology ("CPT") codes, for more severe care than was rendered and for mislabeled patient symptoms in order for UPMC to receive a higher reimbursement from the government. For instance, UPMC routinely billed for ER visits under expensive CPT codes reflecting ER Levels 4 or 5, rather than the less expensive CPT codes reflecting ER Levels 1, 2, or 3.

182.    To conceal the fraud, UPMC misrepresented patient diagnoses by documenting ambiguous and misleading patient symptom codes to skirt medical billing software scrutiny and maximized claim payments associated with the intentional upcoding. In addition, UPMC

deliberately used a combination of codes that described signs and symptoms rather than a single code that described a definitive diagnosis in order to maximize billing.

183.    Through the acts described above, Defendants and its agents and employees knowingly made, used, and caused to be made and used false records and statements to get false or fraudulent claims paid or approved by Medicare and Medicaid. Defendants and their agents and employees knowingly defrauded the United States Government in order to obtain higher reimbursement for ER care at UPMC.

184.    The United States, unaware of the falsity of the records, statements, and claims made by providers impacted by the Defendants and its agents and employees, paid for claims that would not have been paid if the truth were known.

185.    By reasons of the Defendants' false records, statements, and claims, the United States has been damaged, and continues to be damaged in an amount yet to be determined.

## COUNT THREE
### Violations of the Pennsylvania Anti-Fraud Statute
62 Pa. C.S. § 1407
(Alleged against Defendants)

186.    Plaintiff-Relators repeat and reallege each and every allegation contained herein.

187.    This is a claim for penalties and treble damages under the state anti-fraud statute.

188.    Under Pennsylvania law, (a) it is unlawful for any person to:

(1) Knowingly or intentionally present for allowance or payment any false or fraudulent claim or cost report for furnishing services or merchandise under medical assistance, or to knowingly present for allowance or payment any claim or cost report for medically unnecessary services or merchandise under medical assistance, or to knowingly submit false information, for the purpose of obtaining greater compensation than that

38

to which he is legally entitled for furnishing services or merchandise under medical assistance, or to knowingly submit false information for the purpose of obtaining authorization for furnishing services or merchandise under medical assistance;

[...]

(4) Submit a claim for services, supplies or equipment were not rendered to a recipient;

(5) Submit a claim for services, supplies or equipment which includes costs or charges not related to such services, supplies or equipment rendered to the recipient;

(6) Submit a claim or refer a recipient to another provider by referral, order or prescription, for services, supplies or equipment which are not documented in the record in the prescribed manner and are of little or no benefit to the recipient, are below the accepted medical treatment standards, or are unneeded by the recipient; or

(7) Submit a claim which misrepresents the description of services, supplies or equipment dispensed or provided; the dates of services; the identity of the recipient; the identity of the attending, prescribing or referring practitioner; or the identity of the actual provider.

See 62 Pa. C.S. § 1407 (West 2022).

189.    Defendants knowingly presented false claims, based on upcoded ER levels, for higher reimbursement.

39

190.    Specifically, UPMC improperly submitted codes, referred to as Current Procedural Terminology ("CPT") codes, for more severe care than was rendered and for mislabeled patient symptoms in order for UPMC to receive a higher reimbursement from the government. For instance, UPMC routinely billed for ER visits under expensive CPT codes reflecting ER Levels 4 or 5, rather than the less expensive CPT codes reflecting ER Levels 1, 2, or 3.

191.    To conceal the fraud, UPMC misrepresented patient diagnoses by documenting ambiguous and misleading patient symptom codes to skirt medical billing software scrutiny and maximized claim payments associated with the intentional upcoding. In addition, UPMC deliberately used a combination of codes that described signs and symptoms rather than a single code that described a definitive diagnosis in order to maximize billing.

192.    Through the acts described above, the Defendants and their agents and employees knowingly defrauded Pennsylvania in order to obtain higher reimbursement for ER care at UPMC.

193.    As a result, Pennsylvania Commonwealth monies were lost through payments made in respect of the claims and other costs were sustained by Pennsylvania. The Pennsylvania Commonwealth Government has been damaged in an amount to be proven at trial.

194.    Additionally, the Pennsylvania Commonwealth Government is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim presented and caused to be presented by the Defendants and arising from its fraudulent conduct as described herein.

## COUNT FOUR
### FRAUDULENT MISREPRESENTATION
### (Alleged against UPMC Altoona)

195.    Plaintiff-Relators repeat and reallege each and every allegation contained herein.

196.    UPMC Altoona knowingly caused the submission of false claims, based on upcoded ER levels, for higher payment from AASD.

197.    In addition, UPMC Altoona knowingly made false representations to AASD. To conceal the fraud, UPMC misrepresented patient diagnoses by documenting ambiguous and misleading patient symptom codes to skirt medical billing software scrutiny and maximized claim payments associated with the intentional upcoding. In addition, UPMC deliberately used a combination of codes that described signs and symptoms rather than a single code that described a definitive diagnosis in order to maximize billing.

198.    UPMC Altoona knowingly disregarded the falsity of these representations when made to AASD, and UPMC Altoona did so with the intent to deceive or mislead AASD into relying on them and believing that the patient care billed for warranted a Level 4 or 5 ER visit.

199.    As described more fully in the preceding paragraphs of this Complaint, AASD's reliance on UPMC Altoona's misrepresentations proximately caused AASD to suffer damages, which have accrued and are continuing to accrue.

200.    In making the misrepresentations, UPMC Altoona acted willfully, wantonly, and/or with reckless indifference to the harm to AASD that UPMC Altoona's conduct would cause.

**COUNT FIVE**
**NEGLIGENT MISREPRESENTAION**
**(Alleged against UPMC Altoona)**

201.    Plaintiff-Relators repeat and reallege each and every allegation contained herein.

202.    UPMC Altoona knowingly caused the submission of false claims, based on upcoded ER levels, for higher payment from AASD.

203.    In addition, UPMC Altoona knowingly made false representations to AASD. To conceal the fraud, UPMC misrepresented patient diagnoses by documenting ambiguous and misleading patient symptom codes to skirt medical billing software scrutiny and maximized claim payments associated with the intentional upcoding. In addition, UPMC deliberately used a

combination of codes that described signs and symptoms rather than a single code that described a definitive diagnosis in order to maximize billing.

204.    An essential element of a claim for negligent misrepresentation is that the misrepresentation was made under circumstances in which the maker should have known it was false.  UPMC Altoona knew that the representation of Level 4 or 5 billing was false. UPMC Altoona knowingly disregarded the falsity of these representations when made to AASD, and UPMC Altoona did so with the intent to deceive or mislead AASD into relying on them and believing that the patient care billed for warranted a Level 4 or 5 ER visit.

205.    AASD's reliance on UPMC Altoona's misrepresentations proximately caused AASD to suffer damages, which have accrued and are continuing to accrue.

206.    In making the misrepresentations, UPMC Altoona acted willfully, wantonly, and/or with reckless indifference to the harm to AASD that UPMC Altoona's conduct would cause.

## COUNT SIX
## UNJUST ENRICHMENT
### (Alleged against UPMC Altoona)

207.    Plaintiff-Relators repeat and reallege each  and  every allegation contained herein.

208.    UPMC Altoona knowingly caused the submission of false claims, based on upcoded ER levels, for higher payment from AASD.

209.    In addition, UPMC Altoona knowingly made false representations to AASD. To conceal the fraud, UPMC misrepresented patient diagnoses by documenting ambiguous and misleading patient symptom codes to skirt medical billing software scrutiny and maximized claim payments associated with the intentional upcoding. In addition, UPMC deliberately used a combination of codes that described signs and symptoms rather than a single code that described a definitive diagnosis in order to maximize billing.

42

210. UPMC Altoona knowingly disregarded the falsity of these representations when made to AASD, and UPMC Altoona did so with the intent to deceive or mislead AASD into relying on them and believing that the patient care billed for warranted a Level 4 or 5 ER visit.

211. During the school year 2020-2021, AASD paid for claims submitted based on ER care rendered by UPMC Altoona. UPMC Altoona overbilled AASD plan sponsors as Levels 4 or 5. AASD's reliance on UPMC Altoona's conduct proximately caused AASD to suffer damages, which have accrued and are continuing to accrue.

212. As a result, UPMC Altoona directly benefited as a result of AASD's reliance on its misrepresentations. UPMC Altoona has failed to pay AASD for the overcharges.

## COUNT SEVEN
### Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law
### 73 P.S. § 201-1, *et seq.*
### (Alleged against UPMC Altoona)

213. Plaintiff-Relators repeat and reallege each and every allegation contained herein.

214. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1 through 201-9.3, makes it unlawful to, among other things, employ "[u]nfair methods of competition" and "unfair or deceptive acts or practices" by:

   a. "[u]sing deceptive representations . . . in connection with goods or services," 73 P.S. § 201-2(4)(iv);

   b. representing that goods or services "have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have," 73 P.S. § 201-2(4)(v); or

   c. "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding," 73 P.S. § 201-2(4)(xxi).

43

215. "Any person" who pays for services for personal use and suffers actual damages as the result of any prohibited method described in this act may bring a private action to recover damages. 73 P.S. § 201-9.2.

216. "Persons" include but are not limited to natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities within the meaning of the UTPCPL. 73 P.S. § 201-2(2). As such, Plaintiff-Relators are "persons" under the law.

217. By virtue of the acts described above, the Defendants have engaged in unfair or deceptive acts or practices as set forth herein which violated the UTPCPL.

218. The Defendants' actions constitute untrue, deceptive, and misleading misrepresentations and non-disclosure of material facts relating to the extent of the services Defendants provided for AASD plan members. Similarly, Defendants have misrepresented their services as having characteristics they did not have. And Defendants' fraudulent or deceptive conduct created a likelihood of confusion and misunderstanding.

219. Specifically, Defendants made untrue, deceptive, and misleading misrepresentations and non-disclosure of material facts with regards to the upcoding of patients' medical claims for ER visits for non-life-threatening conditions and minimal levels of treatment, describing them as Level 4 or 5—the most severe categories. Defendants also made misrepresentations in patients' medical records about diagnoses or procedures provided to them to exaggerate the severity of their conditions when Defendants knew or should known that such statements were false.

220. Each separate false or misleading claim submitted by Defendants constitutes a separate violation of the UTPCPL. Defendant UPMC Altoona submitted fraudulent and

44

misleading bills for as many as 88 AASD plan members and therefore UPMC Altoona committed as many as 88 separate violations of the UTPCPL.

221. Each separate false or misleading claim submitted by Defendants for other UPMC facilities constitutes a further violation of the UTPCPL.

222. Defendants are jointly and severally liable for their actions, for each of these violations as independent, unfair and deceptive acts in violation of the UTPCPL, and for their course of conduct comprising an unfair and deceptive act or practice in violation of the UTPCPL.

223. As a result of the Defendants' unfair and deceptive acts and practices, Plaintiff and the Class suffered and will continue to suffer ascertainable losses and damages in an amount to be determined at trial, which amounts should be awarded pursuant to 73 P.S. § 201-9.2. These amounts should be trebled, in this Court's discretion, as appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Relators pray for judgment against Defendants as follows:

a. That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.* and corresponding state laws;

b. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of the Defendants' actions, plus a civil penalty of not less than not less than $12,537 and not more than $25,076 for each violation of 31 U.S.C. § 3729 proven at trial;

c. Judgment in an amount equal to threefold the damages to be proven at trial against Defendants and in favor of the Commonwealth of Pennsylvania, plus a civil penalty of $11,000 for each violation proven at trial;

d.      That Relators be awarded the maximum amount allowed pursuant to § 3730(d) of the federal False Claims Act and equivalent provisions of the state and local statutes set forth above, including the costs and expenses of this action and reasonable attorneys' fees; and

e.      Such other, further and different relief, whether preliminary or permanent, legal or equitable, as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relators hereby demand a trial by jury.

Dated:  October 28, 2022

Respectfully submitted:

H. Vincent McKnight, Jr.
vmcknight@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
700 Pennsylvania Ave. SE Suit 300
Washington, D.C. 20003
Telephone: (202) 499-5200
Facsimile: (202) 499-5199

*Attorney for the Relators*