IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES, *ex rel.*, | ) | |
| WILLIAM HENNESSEY, MD, | ) | |
| | ) | |
| Plaintiff/Relator | ) | |
| | ) | |
| v. | ) | Civil No. 3:23-186 |
| | ) | |
| UPMC ALTOONA and UPMC, | ) | |
| | ) | |
| Defendants. | ) | |

## Opinion

Relator William Hennessey, M.D. commenced this *qui tam* action pursuant to the federal

False Claims Act (FCA), 31 U.S.C. §§ 3729, *et seq.*, against Defendants University of Pittsburgh

Medical Center Altoona (UPMC Altoona) and University of Pittsburgh Medical Center (UPMC).

The Relator alleges that Defendants submitted false claims for payment to Medicare and

Medicaid programs, which claims arose from emergency room visits that were improperly billed

at a higher level of care than was warranted, in violation of 31 U.S.C. § 3729(a)(1)(A); and that

Defendants made false statements in connection with the aforesaid false claims for payment, in

violation of 31 U.S.C. § 3729(a)(1)(B). Presently before the Court is Defendants' Motion to

Dismiss the Amended Complaint. ECF No. 54. Relator has filed a Response in Opposition, to

which the Defendants have filed a Reply. ECF Nos. 59 and 60. Oral argument was held before

the Honorable Stephanie L. Haines on August 14, 2025. For the reasons explained below,

Defendants' Motion to Dismiss will be granted, and the Amended Complaint will be dismissed.

## I.      Background

### A.      Parties

Relator William Hennessey, M.D. is the CEO and Founder of Pratter, Inc., described as "a national medical cost savings, advocacy, and transparency company," offering, in part, "to help employers drive down costs associated with employer-offered health benefits." Am. Compl. at ¶ 11. Dr. Hennessey has also practiced medicine in the Pittsburgh, Pennsylvania area for over two decades. *Id.* Defendant UPMC is a nonprofit health enterprise. *Id,* at ¶ 12. Defendant UPMC Altoona is a nonprofit, private community hospital provider and is part of the UPMC health care system. *Id,* at ¶ 13-14.

### B.      Relevant Procedural History

The initial Complaint in this matter was filed in the District of Maryland on October 28, 2022. ECF No. 1. Pursuant to the False Claims Act, the Complaint was filed under seal and was not served upon the Defendants. 31 U.S.C. § 3730(b)(2). On August 17, 2023, pursuant to an Order issued by the Honorable Peter J. Messitte, the case was transferred to the Western District of Pennsylvania.[1] ECF No. 11. Armed with "the complaint and written disclosure of substantially all material evidence and information the [relator] possesses," the government is given an initial 60-day period to investigate the relator's claims and to decide whether to intervene in the matter. *Id.* Pursuant to section 3730(b)(3), the government may seek an extension of time to investigate the allegations, while the Complaint continues to remain under seal. 31 U.S.C. § 3730(b)(3). When the government's investigation has concluded, the government shall inform the Court whether it will "(A) proceed with the action, in which case

---

[1] Upon transfer from the District of Maryland, this case was assigned to the Honorable Kim R. Gibson (deceased). On April 14, 2025, the case was reassigned to the Honorable Stephanie Haines. On January 2, 2026, the case was reassigned to the undersigned.

the action shall be conducted by the Government; or (B) notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action." 31 U.S.C. § 3730(b)(4).  In either case, once the government makes its decision, the complaint is unsealed, the matter proceeds and the complaint is served upon Defendants.

Here, the government sought four extensions of time to investigate Relator's allegations, extending the response time through October 8, 2024, when the government informed the Court of its decision not to intervene in this action. ECF No. 18. The case was unsealed on October 16, 2024, after which Relators voluntarily dismissed two of the three Relators. ECF Nos. 19, 23, 24. The remaining Relator, Dr. Hennessey, filed an Amended Complaint on February 21, 2025. ECF No. 25 (refiled at 30 to correct technical filing error). Subsequently, Relator voluntarily dismissed five of the seven counts, resulting in the present two-count Amended Complaint. ECF No 39. Thereafter, Defendants filed their Motion to Dismiss the Amended Complaint. ECF No. 54.

### C.        Amended Complaint Allegations

Relator alleges that Defendants submitted false claims for reimbursement to Medicare and Medicaid for performing emergency room encounters. Specifically, Relator alleges that Defendants sought reimbursement at a rate higher than warranted by the emergency room visit. Central to Relator's claims is Defendants' use of Current Procedural Terminology codes, also referred to as "CPT codes," or "codes." CPT codes are used to report medical services and procedures to health care payers for reimbursement. According to the American Medical Association, CPT codes "describe medical services and procedures performed by physicians and other qualified health care professionals. As a uniform language of medicine, they enable physicians, providers, payers, regulators, vendors and health care technology organizations to

document, communicate and understand the care provided to patients." https://www.ama-assn.org/practice-management/cpt

There are five code levels at which an emergency room visit may be coded. Relevant here are Level 4 and 5 codes, which indicate a more difficult and severe case. Level 4 indicates a situation of high severity and requires urgent evaluation by the physician, but the situation does not pose an immediate significant threat to life or physiologic function. Such visits are considered to have moderate complexity for medical decision making. Level 5 indicates a situation of high severity, and/or poses an immediate significant threat to life or physiologic function. Such visits are considered to have high complexity for medical decision making. Am. Compl ¶ 52. In determining which code to assign, a provider is to primarily consider the patient's history, the examination of the patient, and the medical decision-making undertaken. Am. Compl. ¶ 52.

Relator alleges that Defendants engaged in a fraudulent scheme to defraud Medicare and Medicaid "by falsely upcoding emergency room ("ER") visits to reflect more expensive levels of care than was provided for each patient." Am. Compl. ¶ 2. Relator alleges that "UPMC facilitated the fraudulent upcoding by making false statements in patient medical records, comprised of misleading and ambiguous symptoms rather than specific diagnoses." Am. Compl. ¶ 77. Relator alleges that, "UPMC deliberately used a combination of codes that described symptoms rather than a single code that described a definitive diagnosis in order to maximize billing." Am. Compl. ¶ 8. For example, according to Relator, for a patient who visits the ER with heartburn symptoms, if "a provider bill[s] for anything higher for the heartburn, any properly running billing software could detect the upcharge and prevent the provider from receiving reimbursement for the more expensive codes." Am. Compl. ¶ 81.

4

Relator supports his allegations with his own expertise as a medical cost savings professional, as well as his personal examination of UPMC Altoona ER visits and claims during the 2020-2021 school year. The UPMC Altoona ER claims were submitted for reimbursement to the Altoona Area School District's private, self-funded health care plan (AASD). Relator's examination of the AASD claims allegedly uncovered the submission of false claims for ER services. Relator discovered ER claims submitted at Level 4 and 5 in situations that he alleges should have been coded at Level 1, 2, or 3. Relator concluded that "almost all the [88] patients that UPMC Altoona had billed for as an ER Level 5 claim did not qualify as a high level of risk, let alone require urgent medical intervention." Am. Compl ¶ 133. Relator reported that only one ER visit was properly coded at Level 5. Relator alleges that the improper coding of AASD claims at Level 4 and 5 by UPMC Altoona, "was far too high to have been unintentional" and "exceeded the rate that Dr. Hennessey observed among other providers for such claims." Am. Compl. ¶ 113. Relator alleges that "many of the [private payor] claims" he reviewed and found to be incorrectly coded, "clearly warranted lower CPT codes," and "foreclosed the possibility that the upcoding occurred by error." Am. Compl. ¶ 114. Relator asserts that "no coding professional would have applied [Level 4 or 5 codes] to these claims unless instructed to do by UPMC, contrary to the proper use of those CPT codes." Am. Compl. ¶ 115.

Next, Relator reviewed a 2017 Center for Medicare and Medicaid Services (CMS) report presenting, at each of the five code levels, the number of Medicare or Medicaid ER visits occurring at all UPMC hospitals during 2017. Relator focuses on the total number of UPMC ER visits coded at Level 4 and 5. The sum of all of UPMC's 2017 coded 4 and 5 ER visits from the report is 100,955, which is 72.3% of the total number of 2017 ER visits, (139,596). Am. Compl. ¶ 60. Relator alleges that this 2017 CMS report shows that UPMC "more commonly billed its

5

Medicare patients at either Levels 4 or 5." Am. Compl. ¶ 60. He further alleges that UPMC billed their Medicare patients at Level 4 and 5 "regardless of the patient's condition or the complexity of the visit." Am. Comp. ¶ 60. Relator alleges that 87% of "those Medicare patients were reported to be discharged." Am. Compl. ¶ 61. In summary, Relator alleges that "UPMC hospitals billed over 70% of their Medicare patients as Levels 4 or 5, suggesting that these Medicare patients were subject to severe urgent care and/or showed a significant threat to life, even though their history, symptoms and/or medical decision-making component did not warrant the Levels 4 or 5 ER visit." Am. Compl. ¶ 62.

Relator also reviewed a 2020 Pennsylvania Department of Health (PA DOH) report showing that, in 2020, eight different UPMC hospitals logged 450,000 ER visits. Am. Compl. ¶ 63. Relator explains that he applied his findings from his review of the AASD UPMC Altoona 2020-2021 ER claim submissions to the 2020 PA DOH report, and estimates that, "the use of the top expensive codes for ER visits were common for Medicare and Medicaid patients at all UPMC hospitals." Am. Compl. ¶ 64. Relator alleges that UPMC hospitals overbilled "at least 55% of their ER visits at Levels 4 or 5, even though on average, only 13% of the patients at each hospital were admitted for life-threatening conditions." Am. Compl. ¶ 64. Relator then calculates his estimate that the eight UPMC hospitals improperly billed "at least" 225,000 ER claims (out of 450,000) at level 4 or 5. Am. Compl. ¶ 66. Relator uses the information he garnered from his review of the 2020-2021 AASD UPMC Altoona ER claims, such as, improper coding, assigning vague symptoms, and not providing a specific diagnosis, to extrapolate such results to support his calculations as to all UPMC ER departments. In practice, this means that Relator alleges that, because 87 of AASD UPMC Altoona's 2020-2021 Level 5 ER claims were fraudulent, the same pattern and practice is occurring across all UPMC ER departments.

To support his claims against UPMC, Relator alleges that UPMC engaged in a scheme using "a centralized billing system that handled the submission of claims, throughout all of its locations. Am. Compl. ¶ 75. Relator alleges that,

> UPMC deliberately reported misleading and ambiguous symptoms to skirt [centralized] medical billing software scrutiny, then billed for the two most expensive codes that reflected ER visits billed at Levels 4 or 5, that should have been billed for as Levels 1, 2, or 3, and then discharged the patient from the hospital.

Am. Compl. ¶ 80. In addition, the scheme permits or encourages providers to assign "misleading and ambiguous symptoms to skirt medical billing software scrutiny." Am. Compl. ¶¶ 80, 87. Relator alleges that "UPMC's centralized billing system allowed all of its locations to engage in upcoding and false billing at the expense of taxpayer dollars." Am. Compl. ¶ 167.

The Amended Complaint asserts two causes of action. Count One alleges that Defendants knowingly presented, or caused to be presented, false claims for payment to the government. 31 U.S.C. § 3729(a)(1)(A). Specifically, Relator claims that Defendants improperly submitted falsely coded claims for emergency room visits, requesting a higher level of reimbursement for more severe care than was rendered and which claims included mislabeled patient symptoms. Count Two alleges that Defendants knowingly made false statements that were material to the submitted false claims. 31 U.S.C. § 3729(a)(1)(B). Finally, Relator alleges that, had the government known that the reported patient symptoms and billing codes were false, the government would not have paid Defendants' claims.

### D. Motion to Dismiss

Defendants move to dismiss Relator's claims for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants also move to dismiss Relator's claims for failure to state averments of fraud with sufficient particularity, as

required by Federal Rule of Civil Procedure 9(b). In addition, Defendants move to dismiss Relator's claims for failure to plausibly plead scienter, as required by Federal Rule of Civil Procedure 8(a). Finally, Defendants submit that Relator should not be given leave to amend his claims.

## II.   Standard of Review

### A.  Rule 12(b)(6)

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Supreme Court clarified that this plausibility standard should not be conflated with a higher probability standard. *Iqbal*, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* 678 (citing *Twombly*, 550 U.S. at 556); *see also Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 147 (3d Cir. 2014). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. In addition, a court need not credit bald assertions, unwarranted inferences, or legal conclusions cast in the form of factual averments. *Morse v. Lower Merion School District*, 132 F.3d 902, 906, n. 8 (3d

8

Cir.1997).  "Factual allegations of a complaint must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

### B.  Rule 9(b) Standard

False Claims Act plaintiffs must [] plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b)."  *Universal Health Servs., Inc. v. United States ex. Rel. Escobar*, 579 U.S. 176, 195 n. 6 (2016). Rule 9(b) provides as follows:

> **(b) Fraud or Mistake; Conditions of Mind.** In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

Fed. R. Civ. Proc. 9(b). The purpose for the heightened pleading standard of Rule 9(b) is to provide defendants, who are alleged to have been involved in some sort of fraud, with fair notice of the claims being made against them, so that they "can intelligently respond." *United States ex rel. Richards v. R & T Invs. LLC*, 29 F. Supp. 3d 553, 560 (W.D. Pa. 2014) (quoting *Illinois Nat. Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 233 (3d Cir.2011)). In analyzing allegations under Rule 9(b), the Third Circuit Court of Appeals has adopted the "more nuanced reading of the heightened pleading requirement" applied by the First, Fifth, and Ninth Circuits. *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 156 (3d Cir. 2014). Pursuant to the nuanced approach, "it is sufficient for a plaintiff to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Foglia*, 754 F.3d at 156 (quoting *Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir.2009)).

### C.  Documents Permitted to be Considered

"Courts 'generally consider only the allegations contained in the complaint, exhibits attached to the complaint[,] and matters of public record' when evaluating whether dismissal

under Rule 12(b)(6) [is] proper." *Levins v. Healthcare Revenue Recovery Grp. LLC*, 902 F.3d 274, 279 (3d Cir. 2018) (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). A court, however, may "consider documents integral to or explicitly relied upon in the complaint or any undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *In re Asbestos Prods. Liab.Litig. (No. VI)*, 822 F.3d 125, 133 n. 7 (3d Cir. 2016). "Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied." *Pension Benefit,* 998 F.2d at 1196. The United States Court of Appeals for the Third Circuit explains that, consideration of such documents is proper because, "'the primary problem raised by looking to documents outside the complaint— lack of notice to the plaintiff—is dissipated where the plaintiff has actual notice ... and has relied upon [those] documents in framing the complaint.'" *Levins*, 902 F.3d at 279-80 (quoting *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (internal quotation marks, alteration, and citation omitted).

Both parties cite to a publicly available 2017 CMS report showing the number of UPMC ER claims submitted with ER codes Level 1 through Level 5. Defendants cite to the 2017 CMS report, which sets forth national data regarding Medicare Part B codes by specialty. Def. Ex. A, ECF No. 60-1. Relator does not provide a citation for the 2017 data he refers to in his Amended Complaint, but the UPMC data cited by Relator matches the data in the 2017 CMS Report cited by Defendants. Am. Compl. ¶ 60. Relator also cites to an excerpt from a 2020 Pennsylvania Department of Health (PA DOH) report, which provides the number of ER visits at each of eight UPMC hospitals from January 1, 2020 to December 31, 2020. Am. Compl. ¶ 63. Each of the parties' references are to undisputedly authentic documents and each is a matter of public record.

The Court takes judicial notice of such documents. Consideration of the documents is proper insofar as they are directly relevant to Relator's Amended Complaint allegations.

### D. Leave to Amend

When a court grants a motion to dismiss, the court "must permit a curative amendment unless such an amendment would be inequitable or futile." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP,* 615 F.3d 159, 174 (3d Cir. 2010) (internal quotations omitted). Further, amendment is inequitable where there is "undue delay, bad faith, dilatory motive, [or] unfair prejudice." *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). Amendment is futile "where an amended complaint 'would fail to state a claim upon which relief could be granted.'" *M.U. v. Downingtown High Sch. E.*, 103 F. Supp. 3d 612, 631 (E.D. Pa. 2015) (quoting *Great W. Mining*, 615 F.3d at 175).

### III. Discussion

### A. Failure to State a Claim

To state a claim under the False Claims Act, the relator must sufficiently allege four elements of an alleged false claim: falsity, causation, knowledge, and materiality. *United States ex rel. Druding v. Care Alternatives*, 952 F.3d 89, 94 (3d Cir. 2020) (*Druding I*). In addition, the claims alleged must be *valid* False Claims Act claims, under the relevant statutory definitions. Defendants argue that Relator fails to state a claim upon which relief can be granted, because he has failed to allege any valid claim under the False Claims Act definition. The False Claims Act defines a "claim," in relevant part, as follows:

> (2) the term "claim"--
> (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--
>     . . . .
>     (ii) is made to a contractor, grantee, or other recipient, if the money or

property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded, . . . .

31 U.S.C. § 3729(b)(2)(A)(ii).

Defendants argue that Relator has failed to satisfy this definition in two ways. First, Defendants claim that any money AASD spent on healthcare costs for its plan members, is not "money spent . . . on the Government's behalf," nor is the money spent "to advance a Government program or interest." 31 U.S.C. § 3729(b)(2)(A)(ii). AASD's health plan is a self-funded program; it is not a federal government program; and therefore, Defendants argue, the money spent by the School District on healthcare costs does not fit within the definition of "money spent on the government's behalf" or "to advance a government program."

Second, Defendants argue that Relator has failed to plausibly allege that any claims submitted to AASD satisfy the requirement that the government either *provides* money, or *reimburses* money, for the School District's claims. Specifically, Defendants argue that that the Relator failed to plausibly allege that the government "*provides* or has *provided* any portion of the money or property requested or demanded." 31 U.S.C. § 3729(b)(2)(A)(ii)(I) (emphasis added). Similarly, Defendants argue that Relator has failed to plausibly allege that the government "will *reimburse* [the School District] for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A)(ii)(II) (emphasis added).

Relator concedes that Defendants' argument is correct. Relator admits that UPMC Altoona's submission of ER claims to the private payor AASD does not fall within the definition of a False Claims Act claim, because such claims do not involve any government program.

12

Relator states that the Amended Complaint does not allege harm to the AASD health plan or to the School District itself. Instead, Relator argues that the allegations of the Amended Complaint create a strong and reasonable inference that UPMC Altoona and UPMC submitted other false claims to government healthcare programs. That argument is addressed below.

The claims submitted to AASD are private payor claims outside the definition of a False Claims Act claim. As Relator concedes, said claims did not involve any government program. Therefore, the Court finds that the AASD UPMC Altoona ER claims reviewed by Relator and submitted to AASD, are not "claims" within the definition of the False Claims Act. Defendants' Motion to Dismiss for failure to state a claim based upon private payor claims will be granted.

### B.  Failure to State a Claim Pursuant to Federal Rule of Procedure 9(b)

Defendants also argue that Relator fails to sufficiently state a claim pursuant to Federal Rule of Civil Procedure 9(b). Relator alleges that Defendants "submitted false claims to Medicare and Medicaid by knowingly billing for emergency department visits at Level 4 and 5 when those visits did not meet the requisite coding guidelines." Opp. Br. at 11 (citing Am. Compl. ¶¶ 170. 179). Because Relator has not identified the existence of any actual false claim that was submitted to government programs by Defendants, he must demonstrate that he has sufficiently "alleged particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Foglia*, 754 F.3d at 156.

Relator's allegations, that Defendants submitted false claims to government payors, are primarily based upon three prongs: the findings from Relator's review of upcoded ER claims submitted to a private payor for the school year 2020-2021; the application and extrapolation of such findings to numbers of reported UPMC ER claims submitted to government programs in

13

2017 and 2020; and the use of a scheme involving a centralized billing system in conjunction with a perceived practice that encourages providers to improperly code visits using vague symptoms and avoiding specific diagnoses.[2] Relator acknowledges that "Dr. Hennessey's personal access to claim records was limited to AASD's private plan data," but he argues that such "does not diminish the reliability of his allegations," because Relator "couples that [limited] detailed review with external data showing that the same patterns [found with the AASD data] occurred across a broader pool of federally insured patients." Br. Opp. 12; 16 ("Amended Complaint provides representative examples, quantifiable extrapolation, and reliable public data that point to the submission of false claims"). Relator argues that his allegations are not speculative, because they are supported, in part, by "detailed, data-driven extrapolation grounded in public health statistics and billing patterns." Br. Opp. 18. Relator alleges that his findings from the AASD claims strongly support the allegation that UPMC systematically overbilled Medicare by applying Level 4 and 5 codes to encounters that did not warrant such codes. He alleges that he

> evaluated actual medical records and identif[ied] a pattern of inflated billing [and] [o]nce that pattern was established, it was confirmed and extended through analysis of publicly reported Medicare data. This combination of individualized record review and large-scale billing statistics forms the basis of the allegations.

Br. Opp. 12. Relator also points to his allegation, set forth in paragraph 166 of the Amended Complaint, in which he "specifically alleges that in some instances, Medicare or Medicaid served as the secondary payor" to AASD. Opp. Br. at 12; Am. Compl. ¶ 166.

Relator's reliance upon applying findings from claims submitted to private payors to

---

[2] Relator states in his brief:

> Through the use of improper documentation practices that presented vague and misleading symptoms rather than specific diagnoses, UPMC was able to justify high-level CPT codes. *Id.* ¶¶ 77–80. By doing so, it increased the likelihood that the medical billing software would accept higher codes and bypass the software's ability to prevent the provider from receiving reimbursement for the more expensive codes. *Id.* ¶ 81.

Br. Opp. 8.

other, unreviewed claims submitted to government programs, is analogous to a case from the District of New Jersey where the Relator, a security alarm systems expert, brought a False Claims Act suit alleging that a private security company had defrauded the federal government with respect to security contracts with the United States Marshal's service for judicial security systems. *United States ex rel. Zwirn v. ADT Security Services, Inc.*, Case No. 10-cv-2639, 2014 WL 2932846, *1 (D.N.J. June 30, 2014). The *Zwirn* relator had reviewed the security company's private residential contracts and found deficiencies in aspects of the security systems. Relator brought suit alleging that, based upon his review of the company's *private* security systems, the same company's *judicial* security systems must also be similarly deficient. *Id.* at *1–2. The Court rejected the argument, because it rested upon the speculative allegation that deficiencies found in a sample of *private* security company contracts would also be present in government contracts entered into with the same security company. *Id.* at *7. The claims were found to be speculative, because they relied almost wholly upon the relator's expertise, rather than upon any alleged factual foundation to suggest that the government contracts were fraudulent. *Id.* at *7–8. The relator also failed to connect the private contract deficiencies to any alleged, non-speculative, government contract deficiencies.

Here, Relator also almost wholly relies upon his expertise and review of private payor claims, rather than upon any alleged factual foundation, to support the allegation that Defendants submitted false claims to Medicare and Medicaid. This is because Relator's alleged factual foundation rests upon Relator's review of only private payor claims. Like in *Zwirn*, Relator provides the speculative allegation, that false claims found in a sample of 2020-2021 private payor claims establishes that claims submitted by Defendants from 2017 to 2023 to government programs, were actionable false claims under the Act. All other allegations to support the alleged

scheme are either generic, conclusory allegations or are unsupported assertions about UPMC's billing, coding, and ER claims handling, that rely upon bootstrapping allegations related to the AASD private payor claims. Through these allegations, the Relator concludes that Defendants also submitted false claims for government reimbursement. Such pleading is insufficient. *See United States ex rel. Frazier v. IASIS Healthcare Corp.*, 812 F. Supp. 2d 1008, 1017 (D. Ariz. 2011) (relator relying on privately insured claims failed to "plead facts showing why the procedures performed [on Medicare patients] ... were unnecessary"). Thus, Relator fails to provide sufficient allegations to connect the private payor false claims to any alleged, non-speculative false claims submitted to a government program by Defendants to support his claim under the False Claim Act.

In addition to the deficient allegations, premised upon analysis of private payor claims to support a False Claims Act claim, Relator's allegations as to government payor false claims are heavily dependent upon his extrapolation of numbers from his review of AASD ER claims from UPMC Altoona for the 2020-2021 time period in relation to reports of national and/or State ER claims numbers. Review of the reports in context with the private payor analysis also leads to the conclusion that the Relator's False Claims Act claims against Defendants are deficient. These arguments are conclusory and insufficient.

Relator's "Medicare billing patterns" refer to the 2017 CMS report and the 2020 PA DOH report that provided the numbers from which Relator derived the percentage he attributes to his claims against Defendants. Neither of these reports offers any information beyond the raw numbers of ER visits. The 2017 CMS report breaks down the 2017 ER visits by code level. A single year, presenting 2017 data , which pre-dated the 2020-2021 review of AASD ER claims by four years, is not reliably indicative of any "billing pattern." In addition, as pointed out by Defendants, the 2017 report demonstrates that UPMC 's percentage of 2017 claims that were

16

coded at Level 4 and 5, are actually 14% lower than the national average.[3] Finally, the allegation, that Relator's private payor findings are not an anomaly, but are representative of UPMC's system-wide billing and coding approaches, is an unsupported, conclusory bootstrap argument. Relator does not offer any concrete factual allegation to explain why a small 2020-2021 sample of AASD private payor claims from one ER department, necessarily or reliably applies to all other unexamined claims submitted to government programs from the entire UPMC network. He fails to point to any factual and non-conclusory allegations to support his assertions that UPMC ER departments submitted false claims to government programs regardless of a patient's condition, the complexity of the visits, whether the patient had non-life-threatening conditions, whether a patient was discharged, or to support his 55% rate application. Thus, the allegations are insufficient, because they do not comply with the requirements of *Foglia*, that the allegations of a fraudulent scheme must be paired with reliable indicia that lead to the strong inference that false claims were actually submitted by UPMC to government programs.

Finally, Relator's allegations of a UPMC-wide fraudulent scheme do not provide sufficient "particular details" to support a strong inference that false claims were submitted by Defendants to government programs. Relator argues that the "upcoding observed at UMPC Altoona was not an anomaly – it was representative of the system-wide billing approach implemented and maintained by UPMC itself". Br. Opp. 19. Relator's allegations are conclusory and factually unsupported. The fraudulent scheme he alleges depends upon assumptions that UPMC deliberately upcoded ER visits through reporting vague and misleading symptoms  and

---

[3] Defendant's Exhibit A, a CMS 2017 excerpted report, sets forth, in relevant part, the number of ER visits coded at each of Level 1 through 5, for the entire country. Def. Ex. A, ECF No. 60-1, at 3-4, 6-8. While Relator alleges in his Amended Complaint that UPMC coded 72.3% of all ER visits at Level 4 and 5, the national data shows that the national percentage of ER visits coded at Level 4 and 5 in 2017 was 86.4%, approximately 14% higher than UPMC's percentage.

deliberately refrained from assigning a simple diagnosis code. Relator also appears to allege that UPMC management was directing providers to miscode ER visits. Then, as the upcoded visits were processed through the centralized billing system, the billing system was unable to recognize that the ER visit was miscoded.

Relator provides practically no details about the alleged centralized billing system. Other than his allegations that the UPMC hospitals are under the same umbrella, Relator does not sufficiently provide supporting allegations that the exact same system is used throughout UPMC. Relator also fails to provide sufficient details regarding UPMC *Altoona's* billing system, in order to make any comparison to any centralized billing system. Relator also does not sufficiently allege how the billing system is unable to detect upcoding errors, other than his conclusory allegation that the system cannot discern a difference between reported symptoms and specific diagnoses. As such, the allegations, concerning a centralized billing system and UPMC medical providers systematically up-coding ER visits, are conclusory, speculative, and insufficient to sufficiently allege the existence of any centralized fraudulent scheme operated across all UPMC ER departments, to sustain Relator's False Claim Act claims.

Lastly, Defendants argue that this case should be dismissed because Relator is unable to sufficiently allege that Defendants knowingly submitted false claims. This issue raises the question of scienter. The False Claims Act provides the following expansive definitions of knowledge:

> (1) the terms "knowing" and "knowingly" --
>
> > (A) mean that a person, with respect to information--
> > (i) has actual knowledge of the information;
> > (ii) acts in deliberate ignorance of the truth or falsity of the information; or
> > (iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b)(1). The allegations of the Amended Complaint, alleging that Defendants knowingly submitted false claims, are sufficient at this stage under Rule 9(b) and the False Claims Act definitions of "knowing" and "knowingly." Accordingly, the Court concludes that, at this stage, Relator has sufficiently plead the element of knowledge. However, having found Relator's Amended Complaint fails to state a false claim under the False Claims Act, the Relator's claims still fail.

The findings derived from the review of UPMC Altoona claims submitted to a private payor do not qualify, in this case, as reliable indicia leading to any strong inference that UPMC and UPMC Altoona submitted false claims to Medicare and Medicaid. In addition, Relator has not sufficiently provided reliable indicia supporting an inference that false claims were submitted to government programs. Further, the Relator has not sufficiently alleged "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Foglia*, 754 F.3d at 156. As such, Defendants' Motion to Dismiss for failure to state a claim pursuant to Rule 9(b) will be granted.

### C. Leave to Amend

Amendment of complaint is futile where any amendment would fail to state a claim upon which relief could be granted. *M.U.*, 103 F. Supp. 3d at 631. Relator has amended his complaint once already. He has also, as required by the False Claims Act, "substantially disclosed all material evidence and information" to the government, which means he was already possession of any evidence or information needed to support his allegations. Relator's allegations clearly demonstrate that his knowledge of direct facts is limited to his review of the private payor AASD

claims. Thus, leave to amend will not be permitted because amendment would be futile.[4]

### IV.   Conclusion

For the reasons stated above, Defendants' Motion to Dismiss will be granted in part and denied in part. An appropriate Order will be entered.

_____
Marilyn J. Horan
United States District Judge

Dated: March 31, 2026

---

[4] In Relator's Brief he included allegations that are not in the Amended Complaint. Even considering such additional allegations, amendment would be futile